1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10                          ----oo0oo----

11

12   JENNIFER LUKAS AND JOYCE          NO. CIV. 2:09-2423 WBS DAD
     WATTERS,
13
              Plaintiffs,             MEMORANDUM OF DECISION
14
         v.
15
     UNITED BEHAVIORAL HEALTH AND
16   IBM MEDICAL AND DENTAL
     EMPLOYEE WELFARE BENEFIT
17   PLANS,

18            Defendants.
     _____/
19

20                          ----oo0oo----

21            Plaintiffs Jennifer Lukas and Joyce Watters brought

22   this Employee Retirement Income Security Act of 1974 ("ERISA")

23   action against defendants United Behavioral Health ("UBH") and

24   IBM Medical and Dental Employee Welfare Benefit Plans ("Plan"[1]),

25   arising from defendants' adverse benefit determination for

26   _____

27        [1]    The caption of the Complaint uses "Plans."  The Summary
     Plan Description uses "Plan."  For consistency, the court will
28   use "Plan."

                                    1

Lukas's residential treatment for an eating disorder, substance abuse, and major depression at Alta Mira Treatment Center ("Alta Mira") on the ground that it was not medically necessary.

On March 10, 2011, the court held a bench trial in accordance with the procedures outlined in <u>Kearney v. Standard Insurance Co.</u>, 175 F.3d 1084 (9th Cir. 1999), and <u>Friedrich v. Intel Corp.</u>, 181 F.3d 1105 (9th Cir. 1999).  The court received in evidence all of plaintiffs' 47 exhibits and all of defendants' 475 exhibits.[2]  Plaintiffs had previously objected to a declaration from Rosemarie Barnes,[3] the Plan Administrator, and the Plan's supplemental responses to plaintiffs' interrogatories, set two, (<u>see</u> Defs.' Exs. 474-75), because plaintiffs had not conducted discovery on the issues raised in those two exhibits. (<u>See</u> Pls.' Objection to & Mot. to Strike Defs.' Exhibit List; Green Decl. in Supp. Thereof (Docket No. 29).)  The court offered to continue the trial in order to allow plaintiffs to conduct further discovery on the identity of IPRO's physician and other matters.  Plaintiffs declined the court's invitation even though it was made clear to plaintiffs that declining the court's invitation would result in the court accepting these two exhibits into evidence.  This memorandum constitutes the court's findings of fact and conclusions of law pursuant to Federal Rule of Civil

_____

[2]      When possible, this Order refers to the Bates number of the exhibits.  Plaintiffs' 47 exhibits are bates-numbered Lukas 1-807.  Defendants' first 470 exhibits are bates-numbered AR 00149-01598 and Lukas 665-807.  Defendants' remaining five exhibits are declarations authenticating their exhibits, a declaration from Rosemarie Barnes, the Plan Administrator, and the Plan's supplemental responses to plaintiffs' interrogatories, set two.

[3]      Barnes testified at the trial.

2

1    Procedure 52(a).

2    I.    <u>Factual and Procedural Background</u>

3          A.    <u>2007 and 2008 Summary Plan Descriptions</u>

4                Lukas, eighteen years old at the time of her treatment,

5    is a dependent of her mother, Watters, an employee of

6    International Business Machines Corporation ("IBM") and a

7    participant of the Plan.[4]  One of the programs offered by the

8    Plan is IBM Managed Mental Health Care Program ("MMHC").  (AR

9    00242.)  Plaintiffs are enrolled in IBM PPO Plus, and Alta Mira

10   is an out-of-network provider.

11               For reimbursement, "out-of-network care must meet

12   medical necessity criteria and is subject to review by the mental

13   health plan administrator."  (AR 00247.)  With respect to out-of-

14   network <u>inpatient</u> care, a participant must pre-certify treatment

15   and, if the care is deemed medically necessary, the care is

16   covered at fifty percent of the usual and prevailing rate.  Pre-

17   certification "does not guarantee that [] care meets the criteria

18   for medical necessity."  (<u>Id.</u>)  Out-of-network inpatient care

19   remains "<u>subject to review by the mental health plan</u>

20   <u>administrator upon claims submission</u>."  (<u>Id.</u> (emphasis added).)

21               Benefits for treatment is based on medical necessity.

22   (AR 00248.)  "Medical Necessity" is defined as follows:

23        To be medically necessary[,] treatment must:

24             •    Be medically required.
25             •    Have a strong likelihood of improving your
                    diagnosed   psychiatric   or   substance   abuse

26   _____

27        [4]    Because the treatment at issue occurred in late 2007
     and early 2008, the 2007 and 2008 Summary Plan Descriptions are
     applicable to this action.  The court will refer to the 2007
28   Summary Plan Description unless otherwise noted.

condition.
- <u>Be the least intensive level of appropriate care for your diagnosed condition in accordance with:</u>
  -- Generally accepted psychiatric and mental health practices.
  -- <u>The professional and technical standards adopted by the administrator.</u>
- Not be rendered mainly for the convenience of the member, the member's family or the provider.
- Not be custodial care. . . .

(<u>Id.</u> (emphases added).)

Alternate levels of care, such as residential, "may be approved by the mental health plan administrator in lieu of inpatient treatment as clinically-appropriate and cost effective." (AR 00251.) If an alternate level of care is proposed, the administrator will "[d]etermine if an alternate level of care is medically necessary" and "[d]etermine if alternate care is a clinically appropriate alternative to hospitalization." (<u>Id.</u>)

The administrator for MMHC is UBH, a managed behavioral health care organization. (AR 00242; <u>see also</u> AR 00302.) UBH's "2007 Level of Care Guidelines: Mental Health" for residential treatment provide that "[a]ny <u>one</u> of the following criteria must be met":

1.  Presence of a pattern of severe impairment in psychosocial functioning due to a behavioral health condition.
2.  Presenting signs and symptoms of a behavioral health condition that clearly demonstrate a clinical need for 24-hour structure, supervision, and active treatment. (This criterion is not intended for use solely as a long-term solution to maintain the stabilization acquired during treatment in a residential facility/program.)
3.  Deterioration of the member's behavioral health condition with the likelihood of requiring inpatient care if the member is not in a residential treatment program. (This criterion is

4

1                        not intended for use solely as a long-term solution
                    to maintain the stabilization acquired during
2                        treatment in a residential facility/program.)

3    (AR 00950 (emphasis added).)

4        B.   <u>Treatment Prior to Alta Mira</u>

5            The Plan paid for Lukas's intensive outpatient,

6    residential, inpatient, and ambulatory detoxification treatment

7    during the seven months prior to Lukas's admission at Alta Mira.

8    (<u>See, e.g.</u>, Pls.' Opening Trial Brief 5:7-8; 7:22-24 (Docket No.

9    30).)  This ERISA action only concerns Lukas's entitlement to

10   benefits for her residential treatment at Alta Mira from October

11   23, 2007, to January 6, 2008.[5]  However, Lukas's prior treatment

12   is relevant to this action, although the parties disagree as to

13   the extent.

14           1.   <u>Summit Eating Disorders and Outreach Program</u>

15                <u>(March 5, 2007, to June 7, 2007)</u>

16           On March 5, 2007, Lukas was admitted to Summit Eating

17   Disorders and Outreach Program ("Summit"), an in-network

18   provider.  (AR 01302.)  Lukas received primarily intensive

19   outpatient treatment there for the next three months.  Intensive

20   outpatient treatment is a higher level of care than outpatient

21   treatment, but a lower level of care than inpatient or

22   residential treatment.  Lukas's benefits under the Plan were

23   subject to periodic authorizations by UBH.

24           When she was admitted (<u>see</u> AR 01332-33; Lukas 359,

25   386), Lukas was diagnosed with bulimia nervosa, generalized

26   _____

27       [5]   The Complaint alleges that Lukas began treatment on
October 23, 2007, and ended treatment on January 6, 2008.
28   However, the evidence indicates that Lukas began treatment on
October 28, 2007, and ended treatment on February 9, 2008.

1  anxiety disorder, "amenorrhea/fatigue/cold intolerance," and

2  problems with her primary support group.  Lukas was restricting

3  her food intake to 200 to 500 calories per day and exercised

4  daily for one to three hours.  She purged five to six times per

5  week.  Lukas also took eighteen to twenty fiber pills and one

6  laxative per day.  Lukas stated that she had "blacked out"

7  several times the previous summer from weakness.  She weighed 125

8  pounds, down from 190 pounds in August 2006.  She was 5' 6".

9            2.   Sober Living by the Sea (June 13, 2007 to

10                 September 9, 2007)

11       For the next three months, Lukas was treated at a

12  residential level of care at Sober Living by the Sea ("Sober

13  Living"), an "accommodated"[6] out-of-network residential treatment

14  center.  Benefits under the Plan for the residential treatment

15  were subject to periodic authorizations by UBH.

16       The precipitating event for treatment at Sober Living

17  was Lukas had reportedly failed at intensive outpatient

18  treatment.  Lukas had been using cocaine nearly daily over the

19  past eighteen months.  She had spent $1,000 on drugs in the

20  previous thirty days and had been drinking alcohol daily to the

21  point of "blackout."  However, Lukas reported that upon admission

22  to Sober Living she did not have drug or alcohol cravings.  At

23  admission, she claimed that she had experienced thoughts of

24  suicide in her lifetime and had attempted suicide in the past.

25  She had been restricting her food intake to 300 to 400 calories

26  per day.  She had been binging, purging, and using laxatives.

27  _____

28       [6]    This means that Sober Living was considered an in-
     network provider for purpose of Lukas's benefits.

1   She was diagnosed with bulimia nervosa, alcohol dependence,

2   cocaine dependence, and problems with her primary support group.

3   (See AR 01346; Lukas 452, 465, 468, 471.)

4              On August 27, 2007, UBH's medical director reviewed

5   Lukas's case. (AR 01360.)  The notes stated: "[Lukas] [is]

6   currently in [an] accommodated [out-of-network] dual [diagnosis]

7   [residential treatment center] for [an] eating disorder, bulimia

8   and substance dependence.  [Lukas] has been in [the] program over

9   70 days [with] minimal progress.  [Lukas] has been restricting.

10  [The weight] on admission was 132 and [is] now 123.4."  It was

11  recommended by UBH's medical director that the case be referred

12  to a primary care physician unless there was significant

13  progress.  By September 7, 2007 (AR 01363), the attending

14  physician at Sober Living was pleased with the progress to date.

15  However, Lukas was continuing to report drug cravings.  She said,

16  "If I was not here I would be using."

17             Lukas was then discharged from Sober Living on

18  September 9, 2007, in order to enter an ambulatory detoxification

19  program.  She had relapsed on alcohol.  UBH informed Sober Living

20  that Lukas would have to be re-admitted and that there was "no

21  guarantee" that the benefits would continue if Lukas was not

22  committed to or motivated for treatment.  (AR 03164-65.)

23             3.   First House Detox Services (September 9, 2007, to

24                  September 19, 2007)

25             On September 9, 2007, Lukas entered First House Detox

26  Services ("First House Detox"), an out-of-network provider

27  providing ambulatory detoxification treatment.  While there,

28  Lukas cut and burned herself.  She also restricted her food

intake.   (AR 01367-68.)

                4.   <u>Sober Living (September 19, 2007, to September 20,</u>
<u>2007)</u>

      On September 19, 2007, Lukas returned to Sober Living.
However, on September 20, 2007, Lukas was discharged from Sober
Living in order to enter College Hospital for inpatient care.   A
nurse at Sober Living had determined that Lukas was in danger of
harming herself.   Lukas had told the nurse that she wanted to
kill herself and that she had a plan to overdose or drink until
she died.   The staff at Sober Living found a razor blade under
her bed.   (AR 01369-71.)

                5.   <u>College Hospital (September 20, 2007, to September</u>
<u>23, 2007)</u>

      The September 21, 2007, initial facility-based review
(AR 01370-75; <u>see also</u> Lukas 412) indicates that Lukas was
admitted to College Hospital for inpatient care with diagnoses of
(1) major depressive disorder (recurrent, severe without
psychotic features), (2) polysubstance dependence, (3) a self-
inflicted burn on the left wrist, and (4) problems related to her
social environment.   Lukas reported that she experienced suicidal
ideation over the past three and a half months.   UBH considered
her "high risk."   Lukas was subject to safety precautions that
included fifteen-minute checks and monitoring one hour after
meals and bathroom restrictions to prevent purging.   UBH
discussed with College Hospital the possibility of an extended
stay in order to allow time for a complete assessment and
recommendation or a transfer to another residential center other
than Sober Living because of the inefficacy of Sober Living.

6.   <u>Sober Living (September 23, 2007, to October 5,</u>
<u>2007)</u>

Lukas returned to Sober Living with a more positive attitude and motivation for treatment.  (AR 01376).  A September 25, 2007, case staffing note (AR 01375) indicates that UBH considered the possibility of transferring Lukas to a different residential treatment center.  In early October, Lukas relapsed on cocaine and alcohol.  (AR 01378-79.)  Sober Living discharged her and recommended a higher level of care.  (AR 01380; <u>see also</u> Lukas 460.)

7.   <u>First House Detox (October 5, 2007, to October 28,</u>
<u>2007)</u>

Lukas was again admitted to First House Detox.  (AR 01378-82.)  UBH considered her "high risk."  For the next few weeks, Watters and UBH exchanged calls about residential treatment centers.  Watters informed UBH that she planned to continue Lukas's treatment at First House Detox until Watters could find a residential treatment center for Lukas.  Watters also indicated that Sober Living was not willing to re-accept Lukas.

C.   <u>Treatment at Alta Mira</u>

Lukas entered Alta Mira on October 28, 2007, and would remain there until February 9, 2008.[7]  (Lukas 7.)  Alta Mira is an out-of-network residential treatment center, and provided the treatment at issue in this ERISA action.

The October 23, 2007, Intake Assessment at Alta Mira

---

[7]   On January 22, 2008, she was transferred to Alta Mira's transitional living program.  (Lukas 7, 657.)

1  (AR 00991-01000) indicates that the "primary issues/precipitating
2  event for seeking help" were anorexia and drug and alcohol abuse.
3  It was noted that Lukas had no current or significant past health
4  issues.   She was not currently taking medication, although she
5  had previously taken antidepressants and sleeping pills.   Lukas
6  had some problems sleeping.   The assessment indicates that she
7  was 5' 6" and weighed 120 pounds.   Lukas had issues with her
8  appetite, food, exercise, purging, and body image.

9         She stated that she did not currently drink alcohol or
10  use drugs.   She had not used cocaine for four months and alcohol
11  for approximately three weeks.   She did not have detoxification
12  symptoms, such as sweats, chills, vomiting, or seizures.   She had
13  been dependent on Klonopin, Ambien, and Valium, but it does not
14  appear that she was currently taking these medications.

15         With respect to her psychological background, she was
16  depressed and had feelings of "hopelessness/worthlessness" and
17  had thoughts of suicide ("fantasy"), but denied any plan or
18  intention to commit suicide at that time.   She said that she had
19  never attempted suicide.   Addictive or compulsive behaviors
20  included shopping, "compulsion (lying, cheating)," and
21  co-dependency.   There was some addictive or compulsive behavior
22  with "sex/love" and possibly "intensity (run late, wait to fill
23  up gas tank)."   Under trauma, the assessment indicates issues
24  with, <u>inter alia</u>, physical abuse, emotional abuse, and sexual
25  abuse.

26         The October 30, 2007, History and Physical Exam (AR
27  1003-06) revealed for the first time that Lukas was molested by
28  her mother's boyfriend at age four and had been raped three times

10

at the ages of seventeen and eighteen years old.  Her physical
conditions and vital signs were normal.  She was diagnosed with
cocaine dependency, anorexia nervosa, major depression, and
general anxiety disorder.  She revealed for the first time that
she had previously used heroin and ecstasy.  Her functional
status was good and there were no barriers to recovery.  No
detoxification was required, no activity restrictions imposed,
and her diet was to be regular.

Lukas's treatment plans initially addressed, <u>inter</u>
<u>alia</u>, anorexia, purging, alcohol/cocaine/heroin abuse, anxiety,
and depression.  (<u>See</u> AR 01063-75 ("Treatment Plans").)
Throughout the next three months Lukas was occasionally resistant
to treatment, defensive, and uncooperative.  (<u>See generally</u> AR
01011-13, 01015-17, 01019-22, 01027, 01029-30, 01032, 01034,
01037, 01041-43, 01046, 1050-57, 01060, 01182 ("Individual
Session Progress Notes").)  On a few occasions, she was also
verbally abusive to staff.  The Individual Session Progress Notes
indicate that Lukas had "serious" issues with self-hatred,
worthlessness, low self-esteem, and abandonment.  The therapist
identified on a couple of occasions the risk of "relapse" with
respect to her eating disorder, suicidal ideation, or substance
abuse.  There were a few instances in which she reported drug
cravings.  Despite the possibility of relapse, a handwritten note
on November 8, 2007, stated that Lukas was eating "normally."
(AR 01055.)  The laboratory results indicate that Lukas did not
use alcohol or drugs while in treatment.  (AR 1007-10; Lukas
532-34, 546-548 (laboratory results).)

In addition to her individual therapy sessions, Lukas

11

participated in group therapy sessions and a "food and mood"
group.  (See AR 01018 ("Progress Note for Somatic Movement
Therapy"); AR 01043, 01049 ("Progress Notes for Expressive Arts
Therapy"); AR 01025, 01033, 01038, 01058 ("Progress Notes for
Food and Mood Group"); AR 01028, 01036, 01044, 01059 ("Group
Progress Notes for Expressive Arts and Movement Therapy"); AR
01017, 01045 ("Group Progress Notes for Somatic Movement and
Expressive Arts Therapy").)  During a few of her group sessions
she was verbally abusive and angry toward other patients.  (See
Progress Notes for Food and Mood Group; Individual Session
Progress Notes.)  However, she was responsive to instructions to
redirect her behavior.

Lukas's family participated in her treatment.  (See
generally AR 01026, 01031, 01035, 01039, 01047-48; Lukas 560-61
("Family Meeting and Program Summaries").)  In family meetings
and programs, Lukas and her parents primarily focused on their
relationship with each other.  Major issues addressed include all
of their emotions, Lukas's perception of her mother's lack of
trust, and Lukas's criticism of her parents' parenting skills.
They also addressed Lukas's desire for a car and Watters's anger
that Lukas had spent $10,000 from a trust to buy drugs.

In early January, it was noted that Lukas participated
"fully" in her treatment and ate a variety of foods.  (AR 01076
("Discharge Summary").  On February 9, 2008, Lukas completed her
treatment at Alta Mira.  (Lukas 7.)

D.  Adverse Benefit Determination

On October 28, 2007, Watters confirmed in a voicemail
that her daughter had been admitted to Alta Mira.  On October 29,

12

1    2007, UBH advised Watters that the "case" on her daughter would

2    be closed because, as Alta Mira is an out-of-network treatment

3    center, UBH was no longer managing Lukas's benefits.  UBH

4    suggested that Watters continue to use UBH as a point of contact.

5    (AR 01382-86.)  In other words, because Lukas was being treated

6    by an out-of-network provider, UBH would no longer be in

7    discussion with Lukas's provider and would not decide whether to

8    authorize further residential treatment on a periodic basis as it

9    did before.  Watters would have to submit a claim for out-of-

10   network benefits.  UBH then followed up with a letter confirming

11   that the out-of-network benefits policy would apply. (AR 00966,

12   01300.)

13         On March 6, 2008, UBH denied Lukas's claim because it

14   determined that the sixty days for out-of-network inpatient

15   <u>substance abuse</u> treatment had already been exhausted.  (AR 01320,

16   AR 01388, AR 01451.)  It appears that Watters was informed of the

17   denial over the telephone.

18         Watters then called UBH and filed a first-level appeal,

19   arguing that the determination was in error because the primary

20   diagnosis was for an eating disorder and substance abuse was a

21   secondary diagnosis.  (AR 01320, 01453.)  On May 14, 2008, Harvey

22   Spikol, a UBH psychologist, agreed with Watters about the primary

23   diagnosis.  (AR 01389.)  However, Spikol also stated that "[i]t

24   appeared that medical necessity criteria for Residential

25   Treatment for 10/23/07 through 1/6/08 may not have been met.

26   Therefore, the chart is referred for review by an appeal

27   reviewer."

28         Dr. Melinda Privette, UBH Associate Medical Director

and Board Certified Psychiatrist, then handled the appeal.   On

May 21, 2008, Dr. Privette informed Watters that her daughter's

first-level appeal was denied.   The letter stated in part:

> A request was made for Residential Treatment Level of
> Care Certification for 10/23/07 to 01/06/08.   The
> clinical information was reviewed, as well as the
> provider records, and the applicable Medical Necessity
> Guidelines.   Based upon the review . . . it is my
> determination that Medical Necessity Requirements for the
> Residential Treatment Level of Care are not met.   Care
> could have occurred with Outpatient providers.
>
> The above determination for Residential Treatment Mental
> Health Services is based on the following UBH Level of
> Care Guidelines criteria.

(AR 00971-72, 01077-81.)

        While Dr. Privette's letter is relatively short, her

case management notes further explained her decision.   (AR

01390.)   Dr. Privette first provided a "Case Summary of

Peer/Admin Review," which stated in part:

> Clinical information reviewed, including case records and
> the provider records. [Lukas] is an 18 year old female
> with diagnoses of anorexia nervosa, polysubstance
> dependence ([alcohol], cocaine, Heroine [IV], opiates),
> [major depressive disorder] and [general anxiety
> disorder].   She was admitted to the facility after
> [substance abuse] treatment.   Admission records indicate
> that [Lukas] was 5' 6", and 120 pounds, at her ideal body
> weight.   She was noted to have depressed mood, poor
> sleep, sober from cocaine for 4 months and [alcohol] for
> 24 days.   Her vital signs were stable and she had no
> medical complications.   She had no [suicidal ideation],
> no [homicidal ideation], no psychosis and no episodes of
> behavioral dyscontrol during the entire time period.   She
> did have some occasional disruptive behavior in groups,
> but responded to redirect.   She noted that her parents
> had divorced when she was two and she lived with her
> mother and stepfather.   The step father [sic] was
> described as controlling and subject to rage outbursts,
> and [] [Lukas] described her mother as an overweight
> bulimic that would have rages when [Lukas] did not make
> all As or was not perfect (e.g., keeping her room clean).
> [Lukas] had a history of molestation at age 4, and was
> raped three times between age of 17 and 18.
>
> During the time period in question, including admission,

> there is no indication that [Lukas] had any eating
> disorder symptoms.  Her height and weight were not
> recorded, there was no indication that her caloric intake
> was of concern or monitored, there was no indication that
> she was purging or required any supervision with meals or
> bathroom privileges.  Family session occurred by
> telephone and focused on [Lukas]'s relationship with her
> parents, and her desire to get a car and go to college.
> They were also frustrated that she had spent 10K of her
> trust fund on drugs.  She attended various groups
> including Somatic Movement therapy and Expressive Arts
> therapy as well as individual therapy.  She went to a
> Food and Mood group and they had activities such as
> shopping at and [sic] organic grocery store, buying the
> facilities [sic] nutritional supplements, and cooking in
> the kitchen.
> Records indicate that [Lukas] complained of drug cravings
> at times, and was occasionally disruptive to peers and
> counselors in groups.
> There is no evidence of severe impairment or need for
> [mental health] residential treatment for eating disorder
> or otherwise based upon [level of care] guidelines.

(Id. (third alteration in original).)  Under "Decision and

Rationale," Dr. Privette wrote, inter alia:

> There is no evidence that you had a severe impairment in
> your functioning due to psychiatric illness, or that you
> had signs and symptoms of a psychiatric illness that
> requires the 24 hour structure and supervision of a
> residential level of care.  There is no evidence that you
> would have deteriorates [sic] if your care continued in
> less restrictive level of care.  There is no evidence
> that you were under your ideal body weight, had any
> eating disorder symptoms, had any medical complications,
> or received any focused, individualized eating disorder
> treatment.

Following the first-level appeal denial, Watters

requested and received UBH's case file on Lukas.  UBH's case file

included, inter alia, UBH's case management notes.[8]  On July 30,

2008, Watters filed a second-level appeal with the Plan

---

[8]    Watters received UBH's case management notes only
through January 2008.  Dr. Privette's internal medical review had
been conducted in May 2008 and thus Watters did not receive this
specific case management note.

1   Administrator.  (AR 01460-65.)  Watters addressed the denial of

2   the first-level appeal based on UBH's level of care guidelines:

> [B]ased on the supporting documentation ("Exhibits D, F,
> G, H, and K") it should be clear that the decision for a
> higher level of care and continuation of treatment was
> made by the member's provider at the time of service.
> The determination of medical necessity was made by the
> member's provider, documented, communicated to UBH, and
> discussed between UBH, the Provider, and myself.  As
> such, denial of coverage based on a retrospectively
> determined lack of medical necessity should not be valid,
> as the medical necessity was determined, documented, and
> communicated before the care was received by the member,
> in accordance with the benefit plan's policies on out of
> network care.

10  Watters enclosed some of UBH's case management notes and a letter

11  from Victoria Green, an MPT Primary Therapist at Alta Mira.

12          The letter from Green attempted to address why

13  residential care was necessary for Lukas.  The letter first

14  stated that Lukas entered Alta Mira for the following "acute"

15  issues: (1) extensive history of anorexia, (2) bulimia nervosa,

16  (3) compulsive exercising, (4) post-traumatic stress disorder due

17  to childhood trauma, and (5) substance abuse.  Green stated that

18  the "containment" and "safety" of residential treatment were

19  "imperative" to make "headway on [Lukas's] eating disorder in

20  light of the above serious issues."  Green then attempted to

21  specifically address why residential care was necessary:

> [Lukas's] daily food intake needed to be calibrated,
> monitored, and supervised.  The treatment plan required
> intake of three full, nutritious, balanced meals a day
> provided by our experienced kitchen.  Consumption of
> these meals needed to be overseen by staff.  In addition,
> she required supervision for two hours after each meal to
> prevent purge episodes.
>
> Since compulsive exercise is a major factor in Ms. Lukas'
> eating disorder she was placed on a no-exercise contract
> during the weight stabilization phase of treatment.  She
> required constant monitoring to avoid the elimination of
> caloric intake through running and other forms of

16

exercise.  When her weight and food behaviors stabilized, appropriate exercise was gradually reintroduced under the supervision of the fitness director who monitored her every workout.

Jennifer required daily blind weigh-ins to guard against sudden dramatic weight plunges which happen so often in eating order treatment and can be very challenging to reverse.

The treatment outlined can be done effectively only in a residential setting due to the need for containment and constant supervision.  In any other setting the above treatment is subject to sabotage and relapse.  Even the most willing client cannot necessarily follow through in the detail and consistency required for successful early recovery of such a complex eating disorder.

On August 27, 2008, Barnes, the Plan Administrator, wrote to Terri Giorgio of IPRO, a medical review company.  Barnes requested that IPRO "provide an independent review of the medical necessity and efficacy of inpatient mental health care" for anorexia nervosa, cocaine dependency, and major depression.  (AR 01313.)  IPRO was paid $735.00.  (Lukas 758.)

IPRO had the claim reviewed by a physician that it retained.  The physician upheld the adverse benefit determination in a two-page handwritten statement that was unsigned.  (Lukas 805-7.)  The name of the physician was redacted when IPRO provided the handwritten statement to plaintiffs in this litigation.  Dr. Monty M. Bodenheimer, Medical Director of Health Care Assessment at IPRO, then reviewed the clinical conclusions of the physician.  (Defs.' Ex. 475.)  On September 9, 2008, Dr. Bodenheimer informed Angel Keys of the results of IPRO's medical review.  (Lukas 759-62; AR 01305-07.)

The letter from Dr. Bodenheimer indicates that the physician reviewed, inter alia, Alta Mira medical records,

Watters's second-level appeal letter, and the letter from Green
of Alta Mira.  Dr. Bodenheimer stated that the findings of the
physician were that Lukas had a history of alcohol abuse, cocaine
abuse, depression, and anxiety and that she had an approximate
four-year history of binging and purging with increased exercise.
Moreover, over the past year she had restricted her diet, used
laxatives, and had cold intolerance and amenorrhea.  Expressly
relying on UBH's level of care guidelines, the physician
concluded:

> After a thorough review of all submitted documents, it is
> now concluded that the insurer's denial should be upheld.
> There was not enough current justification in the
> documentation presented to meet medical necessity
> criteria for residential level of care.  It was not clear
> that there was such severe impairment in psychosocial
> functioning to necessitate this level of care, nor why
> treatment could not have been conducted within a less
> restrictive setting.  There is no clear demonstration
> that this patient requires 24 hour/day supervision,
> structure and treatment for her disorders.  There also is
> no indication that this patient has deteriorated in
> signs, symptoms or functioning.
>
> She may in fact require residential care for the
> treatment of bulimia and anorexia, but the submitted
> documentation does not justify that level of care.

The letter, which did not reveal the name of the
physician, stated that the physician, who is licensed to practice
in New York, is a Board Certified Child and Adolescent
Psychiatrist, a director of a child and adolescent outpatient
emergency services, an Associate Professor of Psychiatry at a
medical school, and an associate division chief for child and
adult psychiatry in a major medical center.  He is a member of
many professional associations, has received several professional
awards and honors, has made numerous presentations at national
meetings, and has published in medical journals, such as <u>American</u>

<u>Journal of Psychiatry</u> and <u>Journal of American Academy of Child</u> <u>and Adolescent Psychiatry</u>.  IPRO screened him for a potential material conflict and determined that none existed.

On September 19, 2008, Barnes informed Watters that, based on IPRO's medical review, she had to deny the appeal.  (AR 01328-30.)  The denial letter repeated most of what the letter from IPRO had contained.  The letter repeated the qualifications of the physician and did not provide his name.  However, the letter did <u>not</u> repeat the physician's findings that Lukas had a history of alcohol abuse, cocaine abuse, depression, and anxiety, that she had an approximate four-year history of binging and purging with increased exercise, and that over the past year she had restricted her diet, used laxatives, and had cold intolerance and amenorrhea.  The letter then repeated the physician's conclusion, which the court has quoted above.  However, the letter did not state that the physician had expressly stated that he was relying on UBH's level of care guidelines.[9]  The letter then informed Watters that the denial was based on the definition of medical necessity and the letter provided the definition.

II.  <u>Discussion</u>

The parties dispute two primary issues, one a matter of interpretation of the Summary Plan Description and the other a

---

[9]   However, by including the physician's conclusion, the letter implied that the physician had applied UBH's level of care guidelines.

19

matter of application of the Summary Plan Description.  First, the parties dispute whether the Summary Plan Description's definition of medical necessity incorporates UBH's level of care guidelines.  Second, the parties dispute whether Lukas's treatment at Alta Mira met the definition of medical necessity.

Under any standard of review, the court finds that UBH's level of care guidelines were expressly incorporated into the Summary Plan Description's definition of medical necessity. UBH is the administrator of MMHC.  The definition of medical necessity requires that the treatment "[b]e the least intensive level of appropriate care for [the participant's] diagnosed condition in accordance with" the "professional and technical standards adopted by the administrator."  (AR 00248.)  The Summary Plan Description also states that if an alternate level of care is proposed, the administrator will "[d]etermine if an alternate level of care is medically necessary."  (AR 00251.) The court turns to the remaining issue of whether Lukas's treatment at Alta Mira met the definition of medical necessity, which incorporates UBH's level of care guidelines.

A.   Standard of Review

A court applies a de novo standard of review to a challenge to an ERISA plan's adverse benefit determination unless the plan confers discretion on the plan administrator.  Jebian v. Hewlett-Packard Co. Emp. Benefits Org. Income, 349 F.3d 1098, 1102 (9th Cir. 2003); see also Kearney, 175 F.3d at 1089 ("That means the default is that the administrator has no discretion, and the administrator has to show that the plan gives it discretionary authority in order to get any judicial deference to

20

its decision."). The word "discretion" need not appear to grant discretionary authority. <u>See, e.g.</u>, <u>Abatie v. Alta Health & Life Ins. Co.</u>, 458 F.3d 955, 963 (9th Cir. 2006).

If discretionary authority is granted to the plan administrator, then "a reviewing court applies an 'abuse of discretion' or--what amounts to the same thing--an 'arbitrary and capricious' standard." <u>Jebian</u>, 349 F.3d at 1103; <u>see also</u> <u>Abatie</u>, 458 F.3d at 963. Under the abuse of discretion standard, the district court is limited to the administrative record. <u>See</u> <u>Jebian</u>, 349 F.3d at 1110 ("While under an abuse of discretion standard our review is limited to the record before the plan administrator, this limitation does not apply to <u>de novo</u> review.") (internal citation omitted).

Here, the 2007 and 2008 Summary Plan Descriptions provide: "The Plan Administrator retains exclusive authority and discretion to interpret the terms of the benefit plans described herein." (AR 00150, 00614; <u>see also</u> AR 00301, 00772.) Accordingly, because the 2007 and 2008 Summary Plan Descriptions confer discretionary authority on the Plan Administrator, the court will apply an abuse of discretion standard of review to the Plan Administrator's determination that Lukas's treatment at Alta Mira was not medically necessary. <u>See</u> <u>Abatie</u>, 458 F.3d at 963; <u>Jebian</u>, 349 F.3d at 1102-03; <u>Kearney</u>, 175 F.3d at 1089.

"Applying a deferential standard of review [] does not mean that the plan administrator will always prevail on the merits. It means only that the plan administrator's interpretation 'will not be disturbed if reasonable.'" <u>Conkright v. Frommert</u>, --- U.S. ----, ----, 130 S. Ct. 1640, 1644 (2010)

1  (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111

2  (1989)); see also Salomaa v. Honda Long Term Disability Plan, ---

3  F.3d ----, ----, 2011 WL 768070, at *7-8 (9th Cir. Mar. 07, 2011)

4  ("We now know that the administrator's decision cannot be

5  disturbed if it is reasonable. . . . Reasonableness does not mean

6  that we would make the same decision.").  The Ninth Circuit has

7  held that abuse of discretion in a factual determination in the

8  ERISA context exists when "'we are left with a definite and firm

9  conviction that a mistake has been committed,' and we may not

10  merely substitute our view for that of the fact finder."   Id. at

11  *8 (quoting United States v. Hinkson, 585 F.3d 1247, 1262 (9th

12  Cir. 2009) (en banc)).  "[The court] consider[s] whether

13  application of a correct legal standard was '(1) illogical, (2)

14  implausible, or (3) without support in inferences that may be

15  drawn from the facts in the record.'"   Id. (quoting Hinkson, 585

16  F.3d at 1262).

17        Other factors may also need to be considered in

18  applying the abuse of discretion standard.  "If the plan

19  administrator or decisionmaker is also the party from whose

20  pocket the claim would have to be paid, such as an insurer or an

21  employer sponsoring a self-funded plan, the court must determine

22  whether the denial of benefits was improperly affected by this

23  conflict of interest.  The burden of proving that its decision

24  was not improperly influenced has, logically, been placed on that

25  administrator."  Muniz v. Amec Const. Mgt., Inc., 623 F.3d 1290,

26  1295 (9th Cir. 2010).  In Abatie, the Ninth Circuit read

27  Firestone as "requir[ing] abuse of discretion review whenever an

28  ERISA plan grants discretion to the plan administrator, but a

review informed by the nature, extent, and effect on the
decision-making process of any conflict of interest that may
appear in the record." <u>Abatie</u>, 458 F.3d at 967.  The existence
of a conflict of interest does not actually alter the standard of
review itself, only its application.[10]  <u>Montour v. Hartford Life
& Acc. Ins. Co.</u>, 588 F.3d 623, 631 (9th Cir. 2009).

        The weight afforded to the conflict factor will vary
case to case.  "A district court, when faced with all the facts
and circumstances, must decide in each case how much or how
little to credit the plan administrator's reason for denying
insurance coverage.  An egregious conflict may weigh more heavily
(that is, may cause the court to find an abuse of discretion more
readily) than a minor, technical conflict might."[11]  <u>Abatie</u>, 458

-----

[10]    A court may consider evidence outside the
administrative record to decide the nature, extent, and effect on
the decision-making process of any conflict of interest.  <u>Abatie
v. Alta Health & Life Ins. Co.</u>, 458 F.3d 955, 970 (9th Cir.
2006).

[11]    In <u>Metropolitan Life Ins. Co. v. Glenn</u>, 554 U.S. 105,
117 (2008), the Supreme Court explained:

    In such instances, any one factor will act as a
    tiebreaker when the other factors are closely balanced,
    the degree of closeness necessary depending upon the
    tiebreaking factor's inherent or case-specific
    importance.  The conflict of interest at issue here, for
    example, should prove more important (perhaps of great
    importance) where circumstances suggest a higher
    likelihood that it affected the benefits decision,
    including, but not limited to, cases where an insurance
    company administrator has a history of biased claims
    administration.  It should prove less important (perhaps
    to the vanishing point) where the administrator has taken
    active steps to reduce potential bias and to promote
    accuracy, for example, by walling off claims
    administrators from those interested in firm finances, or
    by imposing management checks that penalize inaccurate
    decisionmaking irrespective of whom the inaccuracy
    benefits.

F.3d at 968; see also Montour, 588 F.3d at 631 ("[T]he existence
of a conflict [is] a factor to be weighed, adjusting the weight
given that factor based on the degree to which the conflict
appears improperly to have influenced a plan administrator's
decision.").

        "The level of skepticism with which a court views a
conflicted administrator's decision may be low if a structural
conflict of interest is unaccompanied, for example, by any
evidence of malice, of self-dealing, or of a parsimonious
claims-granting history." Abatie, 458 F.3d at 968; see also id.
at 969 n.7 ("For example, the administrator might demonstrate
that it used truly independent medical examiners or a neutral,
independent review process; that its employees do not have
incentives to deny claims; that its interpretations of the plan
have been consistent among patients; or that it has minimized any
potential financial gain through structure of its business (for
example, through a retroactive payment system."). Conversely, a
court may afford greater weight to a conflict when "the
administrator provides inconsistent reasons for denial; fails
adequately to investigate a claim or ask the plaintiff for
necessary evidence; fails to credit a claimant's reliable
evidence; or has repeatedly denied benefits to deserving
participants by interpreting plan terms incorrectly or by making
decisions against the weight of evidence in the record." Id. at
968-69 (internal citations omitted).

        In addition to the conflict factor, the Ninth Circuit
identified other factors as including "the quality and quantity
of the medical evidence, whether the plan administrator subjected

the claimant to an in-person medical evaluation or relied instead on a paper review of the claimant's existing medical records, whether the administrator provided its independent experts 'with all of the relevant evidence[,]' and whether the administrator considered a contrary SSA disability determination, if any." Montour, 588 F.3d at 630 (quoting Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 118 (2008)) (alteration in original).

A procedural irregularity is a matter to be weighed in deciding whether a plan administrator's decision was an abuse of discretion. Abatie, 458 F.3d at 972. "When an administrator can show that it has engaged in an 'ongoing, good faith exchange of information between the administrator and the claimant,' the court should give the administrator's decision broad deference notwithstanding a minor irregularity. Id. (quoting Jebian, 349 F.3d at 1107). On the other hand, "[a] more serious procedural irregularity may weigh more heavily."[12]   Id.

B.   Medical Records, IPRO's Medical Review, UBH's Case
        Management Notes

It is clear from Lukas's medical records from Alta Mira that Lukas suffered from cocaine dependency, anorexia nervosa, major depression, and general anxiety disorder. However, the Alta Mira medical records are lacking in any indication that Lukas restricted her food intake, binged, purged, excessively

---

[12]   "Even when procedural irregularities are smaller . . . and abuse of discretion review applies, the court may take additional evidence when the irregularities have prevented full development of the administrative record. In that way the court may, in essence, recreate what the administrative record would have been had the procedure been correct." Abatie, 458 F.3d at 973.

25

exercised, used drugs or alcohol, harmed herself, or experienced
suicidal ideation at Alta Mira.  The medical records only
indicate a few occasions of reported urges or cravings during
three months in treatment.

Lukas's medical records from Alta Mira stand in
contrast to UBH's case management notes and Lukas's medical
records from her treatment at Summit, Sober Living, and College
Hospital the preceding seven months.[13]  At different times in
that period, Lukas restricted her food intake, binged, purged,
excessively exercised, used drugs and alcohol, harmed herself,
and experienced suicidal ideation.  She also often reported urges
and cravings.  Accordingly, UBH periodically authorized intensive
outpatient, residential, inpatient, and ambulatory detoxification
treatment.[14]

Watters attached a letter from Green, an Alta Mira MPT
Primary Therapist, to her second-level appeal letter.  The letter
from Green stated that Lukas entered Alta Mira for the "acute"

_____

[13]   Plaintiffs have not provided medical records from First
House Detox.  Lukas was treated here in mid-September and in the
three weeks preceding her admission at Alta Mira.

[14]   Plaintiffs argue that the fact that UBH previously
authorized residential treatment means that Lukas's treatment at
Alta Mira also met UBH's level of care guidelines.  Plaintiffs
primarily rely on the first criterion in UBH's level of care
guidelines, which requires a presence of a pattern of severe
impairment in psychosocial functioning.  (Pls.' Reply to Defs'
Opp'n to Pls.' Trial Brief at 7:25-8:2 ("Defendants' approval of
prior claims for Ms. Lukas's treatment at Sober Living By The Sea
demonstrates that she did qualify for residential treatment
benefits under the UBH Guidelines less than a month prior to her
admission at Alta Mira.") (Docket No. 48).)  While Lukas's prior
treatment is relevant, nothing in the definition of medical
necessity or UBH's level of care guidelines forecloses the
possibility that a claimant may no longer need residential
treatment, despite having previously needed it.

26

issues of (1) an extensive history of anorexia, (2) bulimia nervosa, (3) compulsive exercising, (4) post-traumatic stress disorder due to childhood trauma, and (5) substance abuse.  Green concluded that Lukas needed residential treatment without explaining why she needed it.  (AR 01460-65.)  Green did not provide additional Alta Mira medical records indicating that Lukas experienced symptoms while in treatment.  Moreover, none of the additional Alta Mira medical records that plaintiffs have offered and the court has treated as part of the administrative record indicate that Lukas experienced symptoms.

IPRO's medical review considered, inter alia, the Alta Mira medical records, some of UBH's case management notes, and the letter from Green.  IPRO's medical review was conducted by Dr. Bodenheimer, IPRO's medical director, and a physician, who is a Board Certified Child and Adolescent Psychiatrist, a director of a child and adolescent outpatient emergency services, an Associate Professor of Psychiatry at a medical school, and an associate division chief for child and adult psychiatry in a major medical center.[15]  The physician is a member of many professional associations, has received several professional awards and honors, has made numerous presentations at national meetings, and has published in medical journals, such as American Journal of Psychiatry and Journal of American Academy of Child and Adolescent Psychiatry.

IPRO's medical review recognized that Lukas had a

---

[15]  IPRO did not reveal the name of the physician to the Plan Administrator.  As previously stated, plaintiffs declined the court's invitation to continue the trial in order to allow for additional discovery.

history of alcohol abuse, cocaine abuse, depression, and anxiety and that she had an approximate four-year history of binging and purging with increased exercise.  The medical review also recognized that in the past year she had restricted her diet, used laxatives, and had cold intolerance and amenorrhea. However, in light of the lack of evidence in the Alta Mira medical records, IPRO's medical review concluded:

> It was not clear that there was such severe impairment in psychosocial functioning to necessitate this level of care, nor why treatment could not have been conducted within a less restrictive setting.  There is no clear demonstration that this patient requires 24 hour/day supervision, structure and treatment for her disorders. There also is no indication that this patient has deteriorated in signs, symptoms or functioning.

(Lukas 759-62; AR 01305-07.)

   C.   Structural Conflict of Interest

        The Summary Plan Description states that the Plan is "[s]elf insured by IBM and funded by employee and employer contributions." (AR 00302.)  The Plan Administrator has discretion to determine benefits eligibility.  Accordingly, the Plan Administrator operates under a structural conflict of interest.  Muniz, 623 F.3d at 1295; see also Huss v. IBM Medical and Dental Plan, No. 07 C 7028, 2009 WL 780048, at *6 (N.D. Ill. Mar. 20, 2009) ("In addition, the conflict of interest resulting from IBM's dual role of funding the Plan and deciding claims under the Plan must be considered as a factor in determining whether Barnes abused her discretion as the plan's administrator.") (internal quotation marks omitted).

        The court must decide how much weight to afford to this factor because the weight afforded to a conflict factor varies

1    case to case, informed by the nature, extent, and effect on the

2    decision-making process of the conflict.  See Montour, 588 F.3d

3    at 631; Abatie, 458 F.3d at 967-68.  The court finds that the

4    structural conflict of interest warrants increased skepticism.

5    However, the court finds that the effect of the structural

6    conflict of interest was minimal for the following five reasons.

7         First, the structural conflict of interest is

8    unaccompanied by any evidence of malice, self-dealing, or

9    parsimonious claims-granting history.  See Abatie, 458 F.3d at

10   968-69.

11        Second, while the reason for the denial changed from

12   exhaustion of substance abuse benefits to medical necessity, the

13   court finds that this one-time change in the grounds for denial

14   between the initial adverse benefit determination and first-level

15   appeal determination does not amount to "inconsistent reasons for

16   denial."  Id.  The first-level appeal and second-level appeal

17   determinations relied on the same grounds of medical necessity.

18        Third, the Plan Administrator did not fail to

19   adequately investigate the claim or ask plaintiffs for necessary

20   evidence.  Id.  The record indicates that medical records were

21   requested from Alta Mira and Watters was informed of her right to

22   provide additional documents.  Watters accordingly offered

23   additional documents.  Plaintiffs' only argument seems to be that

24   Dr. Privette, in conducting a first-level appeal medical review,

25   should have requested more medical records if the medical records

26   did not address Dr. Privette's concerns that there were no

27   indications that Lukas had eating disorder symptoms because

28   "[h]er height and weight were not recorded, there was no

1   indication that her caloric intake was of concern or monitored,

2   [and] there was no indication that she was purging or required

3   any supervision with meals or bathroom privileges." (AR 01390.)

4   Even if Dr. Privette erred,[16] Watters attached the letter from

5   Green to her second-level appeal letter.  The letter from Green

6   addressed the concerns raised by Dr. Privette, although Green

7   only offered conclusory statements.

8        Fourth, the Plan Administrator did not fail to credit

9   the claimant's reliable evidence.  Id.  Even though IPRO

10  ultimately concluded that residential treatment was not medically

11  necessary, the letter from Green was properly considered by IPRO

12  when it conducted a medical review on the second-level appeal.

13       Fifth, the Plan Administrator has provided affirmative

14  evidence of neutrality.  See Metro. Life Ins. Co., 554 U.S. at

15  117; Abatie, 458 F.3d at 969, 969 n.7.  Barnes, the Plan

16  Administrator, provided a declaration and testified on the issue

17  of the structural conflict of interest.  (Defs.' Ex. 474.)

18  Barnes identified the following steps that she has taken to

19  reduce potential bias and to promote accuracy.  UBH, not the Plan

20  Administrator, makes the initial benefit determination.  The

21  first-level appeal benefit determination is decided by an

22  associate in UBH that had no role or input in the initial benefit

23  determination.  The second-level appeal is assigned to Barnes.

24  Barnes testified that she then assigns the second-level appeal to

25

26       [16]  Plaintiffs have not specified what additional medical
     records Dr. Privette would have received had she asked for them.
27   As noted earlier, none of the additional Alta Mira medical
     records that the court treats as part of the administrative
28   record indicate that Lukas experienced symptoms while in
     treatment.

1  IPRO, a wholly independent medical review company, for external
2  review.

3          IPRO retains a consultant physician.  Thereafter,
4  IPRO's medical director conducts "his own review of the clinical
5  conclusions of that physician and affixes his signature to the
6  medical review report upon his satisfaction that the physician
7  reviewer has rendered an accurate, impartial decision." (Defs.'
8  Ex. 474.)  IPRO's medical director and the physician "analyze the
9  case sent to them for medical necessity review separately and
10 without consideration of other claims, appeal, any set reserve
11 amount, and the cost to IBM Plan to approve or deny a claim or
12 IPRO's future assignment of appeal reviews from IBM Plan."[17]
13 (Id.)  Once the physician has made his recommendations and IPRO's
14 medical director has approved those recommendations, the office
15 of the Plan Administrator receives a medical report from the IPRO
16 medical director.  Barnes states that she "thereafter make[s] the
17 final appeals decision based on those recommendations and
18 notif[ies] the claimant of that decision."  (Id.)

19         Barnes is "separate from and not involved with those
20 persons responsible for IBM Plan's financial operations or
21 decisions.  Appeal investigations and decisions are made
22 separately from, and without consideration of, the financial
23 affairs of IBM Plan."  (Id.)

24         In sum, the court finds that the structural conflict of
25

26         [17]    Barnes testified that from 2005 to 2009 IPRO supported
27 the decision to deny medical benefits in 348 of 594 medical
   reviews that the she referred to IPRO.  In other words, IPRO
28 upheld the decision 58.6 percent of the time and overturned the
   decision 41.4 percent of the time.

interest warrants increased skepticism.  However, the effect of the structural conflict of interest was lessened for reasons outlined above.

   D.   Procedural Irregularities

      1.   Initial Adverse Benefit Determination

         A plan administrator is required to provide a written or electronic notification of an initial adverse benefit determination.  29 C.F.R. § 2560.503-1(g)(1).  The adverse benefit determination must include, in a manner calculated to be understood by the claimant, (i) the specific reason or reasons for the adverse determination, (ii) reference to the specific plan provision on which the determination is based, and (iii) a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary.  Id. § 2560.503-1(g)(1)(i)-(iii).  As the Ninth Circuit characterized what is required:

> [T]his regulation calls for [] a meaningful dialogue between ERISA plan administrators and their beneficiaries.  If benefits are denied in whole or in part, the reason for the denial must be stated in reasonably clear language, with specific reference to the plan provisions that form the basis for the denial; if the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it. There is nothing extraordinary about this; it's how civilized people communicate with each other regarding important matters.

Booton v. Lockheed Med. Ben. Plan, 110 F.3d 1461, 1463 (9th Cir. 1997).

         Here, UBH violated ERISA procedures by failing to send a written denial notification.  It appears that Watters was told over the telephone that the substance abuse benefits were

1  exhausted.  The court will apply increased skepticism as a result
2  of this procedural irregularity.  However, the effect of this
3  procedural violation was slight because Watters had no difficulty
4  in appealing the initial benefit determination.

5                      2.  First-Level Appeal Denial

6          A claimant must have a "reasonable opportunity" to
7  appeal and be provided a "full and fair review."  29 C.F.R. §
8  2560.503-1(h)(1).  "Full and fair" review includes "provid[ing],
9  upon request and free of charge, reasonable access to, and copies
10 of, all documents, records, and other information relevant to the
11 claimant's claim for benefits."  Id. § 2560.503-1(h)(2)(iii).

12         In notifying a claimant of an adverse benefit
13 determination on appeal, the plan administrator must provide (1)
14 the specific reason or reasons for the determination, (2)
15 reference to the specific provisions on which the determination
16 is based, and (3) a statement that the claimant is entitled to
17 receive all documents, records, and information relevant to the
18 claim.  Id. § 2560.503-1(j)(1)-(3).

19         In the case of a group health plan, the notification
20 must also provide, if the adverse determination was based on
21 medical necessity, "either an explanation of the scientific or
22 clinical judgment for the determination, applying the terms of
23 the plan to the claimant's medical circumstances, or a statement
24 that such explanation will be provided free of charge upon
25 request."  Id. § 2560.503-1(j)(5)(ii).

26         In her letter, Dr. Privette explained that the first-
27 level appeal denial was based on UBH's level of care guidelines.
28 However, Dr. Privette did not provide "either an explanation of

                                  33

the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances, or a statement that such explanation [would] be provided free of charge upon request." Id. § 2560.503-1(j)(5)(ii). Moreover, when Watters requested UBH's case file, she did not receive Dr. Privette's internal medical review. See id. § 2560.503-1(h)(2)(iii); Teen Help, Inc. v. Operating Eng'rs Health & Welfare Trust Fund, No. C 98-2084, 1999 WL 1069756, at *4 (N.D. Cal. Aug. 24, 1999) ("Without the medical reviewer's rationale, the claimant is left to shoot at a cloaked target and cannot deploy her arguments and evidence in a fashion that will meaningfully address the administrator's concerns.").

The court will apply increased skepticism because of these procedural irregularities related to the first-level appeal. However, the court finds that the effect of these procedural irregularities were minor considering the "meaningful dialogue," Booton, 110 F.3d at 1463, the parties engaged in on the second-level appeal. Watter's second-level appeal letter directly addressed UBH's level of care guidelines. The letter from Green also attempted to address why residential treatment was necessary.

3.   Second-Level Appeal Denial

"The claims procedures of a group health plan will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination unless," inter alia, "the appropriate named fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine

1  involved in the medical judgment" when an adverse benefit

2  determination is based on medical judgment.   29 C.F.R. §

3  2560.503-1(h)(3)(iii).

4          Here, the Plan Administrator requested that IPRO, an

5  independent medical review company, conduct an independent

6  medical review.   The medical review was conducted by Dr.

7  Bodenheimer and a physician.   The court will apply increased

8  skepticism because the Plan Administrator did not know the name

9  of the physician.   However, while IPRO did not reveal the name of

10 the physician to the Plan Administrator, IPRO informed the Plan

11 Administrator of the physician's qualifications, as described

12 above.   IPRO also told the Plan Administrator that it had

13 screened the physician for a material conflict and determined

14 that none existed.   Thus, the Plan Administrator consulted with

15 an expert "who ha[d] appropriate training and experience in the

16 field of medicine involved in the medical judgment."   <u>Id.</u> §

17 2560.503-1(h)(3)(iii).

18         However, claims procedures are also required to

19 "[p]rovide for the <u>identification</u> of medical . . . experts whose

20 advice was obtained on behalf of the plan in connection with a

21 claimant's adverse benefit determination, without regard to

22 whether the advice was relied upon in making the benefit

23 determination."   <u>Id.</u> § 2560.503-1(h)(3)(iv) (emphasis added).

24 <u>But cf.</u> <u>Simonia v. Glendale Nissan/Infiniti Disability Plan</u>, 378

25 Fed. App'x 725, 727 (9th Cir. 2010) ("Even assuming that Hartford

26 violated 29 C.F.R. § 2560.503-1(h)(3)(iv) by failing to identify

27 the "Rehabilitation Clinical Case Manager" by name, Simonia

28 points to no prejudice resulting from such violation that would

35

merit any relief.  Because the 2007 Assessment of Employability explained the underlying methodology for its conclusion, we are satisfied that Hartford substantially complied with ERISA claims procedures and therefore provided Simonia's claim the requisite full and fair review.").

The Plan Administrator did not provide the <u>name</u> of the physician to plaintiffs.  This resulted in a violation of ERISA procedures.  <u>See</u> <u>Gaines v. Guardian Life Ins. Co. of Am.</u>, Civil Action No. AW-09-1762, 2010 WL 1759579, at *7 (D. Md. Apr. 30, 2010) ("[T]he Court believes that the statute's plain language requiring identification of a medical consultant compels an administrator to reveal more than merely the consultant's qualifications. . . . The Court does not find, however, that this failure to provide the name requires a remand or denial of summary judgment.  Guardian has substantially complied with ERISA's identification requirement and in any case, Gaines has not shown how lack of access to the names of the reviewing physicians has deprived her of an appropriate claim decision."); <u>Hernandez ex rel. Hernandez v. Prudential Ins. Co.</u>, Nos. 2:99-CV-898B, 26EBC1423, 2001 WL 1152835, at *7 (D. Utah Mar. 28, 2001).

E.    <u>Other Factors</u>

The court turns to the remaining factors identified in <u>Montour</u> in applying the abuse of discretion standard.  First, the court finds that the quality and quantity of the medical evidence was more than adequate.  <u>See</u> <u>Montour</u>, 588 F.3d at 630.  Lukas's medical records from Alta Mira are extensive, covering three months of treatment.  The Plan Administrator also had UBH's case

1    management notes from the prior seven months of treatment.

2          Other factors to consider in the abuse of discretion

3    standard of review include whether the plan administrator

4    subjected the claimant to an in-person medical evaluation or

5    relied instead on a paper review of the claimant's existing

6    medical records.  Id.  The Plan Administrator did not conduct an

7    in-person medical evaluation.  However, the significance of only

8    conducting a paper review is lessened by the fact that UBH took

9    an active role in managing Lukas's treatment prior to Alta Mira.

10   UBH's case management notes were detailed and reflect an in-depth

11   understanding of Lukas's medical condition and history.

12         The court finds that the Plan Administrator provided

13   its independent experts with all of the relevant evidence.  Id.

14   IPRO received some of UBH's case management notes, in addition to

15   the Alta Mira medical records for Lukas.  IPRO also received

16   Watters's second-level appeal letter, which included the letter

17   from Green.  IPRO's medical review indicates that all of these

18   documents were considered.

19        F.  Conclusion

20         The court finds that the Plan Administrator did not

21   abuse her discretion even when applying increased skepticism

22   warranted under the Montour and Abatie factors.  The court finds

23   the Plan Administrator's decision to be supported by the lack of

24   evidence in the medical records indicating that residential

25   treatment was medically necessary and IPRO's medical review

26   concluding that the level of care was not medically necessary.

27   The court finds that the Plan Administrator's application of the

28   definition of medical necessity, including UBH's level of care

                              37

guidelines, was not (1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record.  See Salomaa, 2011 WL 768070, at *7-8.

In other words, it was not illogical, implausible, or without support in inferences that may be drawn from the facts in the record for the Plan Administrator to conclude that there was not (1) a presence of a pattern of severe impairment in psychosocial functioning due to a behavioral health condition,[18] (2) presenting of signs and symptoms of a behavioral health condition that clearly demonstrated a clinical need for 24-hour structure, supervision, and active treatment, or (3) deterioration of Lukas's behavioral health condition with the likelihood of requiring inpatient care if Lukas was not in a residential treatment program.

///

///

///

_____

[18]   Plaintiffs request that this court judicially notice a decision of an administrative law judge of the Maryland Office of Administrative Hearings.  (Pls.' Request for Judicial Notice Ex. A (Docket No. 42).)  In that decision, the administrative law judge interpreted UBH's level of care guidelines.  Applying a de novo standard of review, the administrative law judge held that the "presence of a pattern of severe impairment" in psychosocial functioning due to a psychiatric illness allows for a consideration of observations over a period of time to determine a pattern.  That judge considered a two-year period prior to the residential treatment to determine whether a pattern of severe impairment existed.  This court can consider the legal reasoning of the administrative judge without judicially noticing the opinion.  The court notes that this administrative law opinion does not stand for the proposition that a previous determination that UBH's residential level of care guidelines were met forecloses the possibility that they will not be met in the future.  The pattern of severe impairment in psychosocial functioning must still be present.

1          IT IS THEREFORE ORDERED that plaintiffs take nothing on

2     their claims, and that judgment be entered in favor of the

3     defendants and against the plaintiffs in this action.

4     DATED:  April 14, 2011

5

6     _____

7     WILLIAM B. SHUBB
      UNITED STATES DISTRICT JUDGE

39